[Cite as *In re M.W.*, 2023-Ohio-3889.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE M.W., ET AL. | : | |
| | : | No. 112718 |
| Minor Children | : | |
| | : | |
| [Appeal by Mother, F.W.] | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 26, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD23900573 and AD23900574

***Appearances:***

Rachel A. Kopec, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

MARY J. BOYLE, J.:

{¶ 1} Appellant-mother ("Mother") appeals from the juvenile court order awarding permanent custody of her children, M.W. (d.o.b. 06/01/18) and E.W. (d.o.b. 08/11/22), to the Cuyahoga County Division of Children and Family Services ("CCDCFS"), raising the following assignments of error for review:

**Assignment of Error One:** Permanent custody of the children was against the manifest weight of the evidence.

**Assignment of Error Two:** The GAL report fell short.

{¶ 2} After a review of the record and relevant case law, we affirm.

## I. Facts and Procedural History

{¶ 3} This matter began in 2019 when M.W. and another sibling (d.o.b. 06/05/17) were removed from Mother's care and placed with foster care while in the temporary custody of CCDCFS. At that time, CCDCFS planned for permanent custody, but changed its disposition for legal custody to a paternal aunt, who received custody of M.W. and his sibling around November 2021. The children were with paternal aunt until May 2022, when CCDCFS received a referral because M.W.'s sibling died in paternal aunt's home. Paternal aunt was unable to provide an adequate explanation as to how the sibling's injuries occurred. Subsequently, paternal aunt and her paramour were criminally charged with the murder of the child, child endangering, and felonious assault and were incarcerated, and M.W. was placed back with his initial foster caregiver. CCDCFS's investigation revealed that M.W. was severely dehydrated, hungry, and thin and had numerous marks and bruises all over his body in various stages of healing while under paternal aunt's care. Mother was pregnant with E.W. at the time and tested positive for marijuana at E.W.'s birth in August 2022. As a result, CCDCFS placed E.W. in temporary custody at that time.

{¶ 4} Because the complaints regarding M.W. and E.W. could not be resolved within the statutory time frame, the complaints were refiled two other

times before the January 2023 complaint was filed in the appeal before us.[1] In this complaint, CCDCFS requested permanent custody, and alleged that M.W. was previously committed to predispositional custody in May 2022, E.W. was previously committed to predispositional custody in August 2022, and the two children have remained in the uninterrupted custody of CCDCFS since those times.

{¶ 5} In addition to the circumstances surrounding M.W.'s and E.W.'s placement in 2022, the complaint also alleged that Mother has mental health and substance abuse issues that interfere with her ability to provide appropriate supervision and care for the children, lacks appropriate judgment and parenting skills to provide safe and adequate care for the children, and does not have stable housing for the children. Furthermore, in April 2022, Mother pled guilty to theft, aggravated theft, and misuse of credit cards and was on probation. Father of M.W. was incarcerated at the time for felonious assault, aggravated robbery, child endangering, and domestic violence, and his expected release date from prison is in 2025. The alleged father of E.W. had not established paternity and failed to support, visit, or communicate with the child since birth.

{¶ 6} CCDCFS also filed a motion for predispositional temporary custody the same day, which the court granted. CCDCFS filed a case plan on February 3, 2023. On March 20, 2023, Mother's counsel filed a motion for legal custody, asking

---

[1] *In re M.W.* is designated Cuyahoga J.C. No. AD23900573 and *In re E.W.* is designated Cuyahoga J.C. No. AD23900574. The relevant filings are virtually identical. For ease of discussion, any reference to the docket will be made from *In re M.W.*, Cuyahoga J.C. No. AD23900573, unless otherwise specified.

that maternal grandfather be considered for legal custody. The motion, however, did not contain a statement of understanding as required by R.C. 2151.353(A)(3).[2]

{¶ 7} On April 6, 2023, an adjudicatory hearing was held, where the court heard testimony and accepted evidence. At the conclusion of the hearing, CCDCFS and the court moved to amend the complaint. The complaint was amended to include the name of paternal aunt's paramour and reflect that Mother has not completed her mental health and substance abuse treatment. The court adjudicated M.W. as abused and neglected and E.W. as dependent and continued the matter for a dispositional hearing on April 10, 2023, at which the following evidence was adduced.[3]

{¶ 8} CCDCFS first became involved with the family in 2019, at which time M.W. and another sibling were removed from Mother's care and ultimately placed in the legal custody of the paternal aunt in 2021. CCDCFS social service worker Jennifer Wagner ("Social Service Worker Wagner") testified that in May 2022, CCDCFS received a referral in relation to the death of the other sibling in paternal aunt's home. She further testified that the paternal aunt and her paramour were criminally charged with aggravated murder, felonious assault, and child endangering and were incarcerated pending resolution of those charges. Social

_____

[2] R.C. 2151.353 provides in relevant part, "[a] person identified in a * * * motion filed by a party to the proceedings as a proposed legal custodian shall be awarded legal custody of the child only if the person identified signs a statement of understanding[.]"

[3] The trial court granted CCDCFS's request at the dispositional hearing that the court incorporate all the evidence admitted during the adjudication hearing.

Service Worker Wagner testified that paternal aunt was unable to provide an adequate explanation as to how the sibling's injuries occurred. Her investigation revealed that M.W. had bruises in different stages of healing and was dehydrated, thin, and malnourished, and paternal aunt could not give an adequate explanation for what had happened.

{¶ 9} At that time, CCDCFS had continuing concerns regarding Mother's ongoing and unresolved issues with substance abuse, mental health, housing instability, parenting, and involvement in criminal activity. The case worker had several conversations with Mother, including a discussion about Mother's previous case plan services. Mother admitted to the case worker to smoking marijuana. At that time, she was approximately 20 weeks pregnant with E.W. Mother tested positive for marijuana at the time of E.W.'s birth in August 2022. With regard to housing, Mother advised that she was staying "here and there" with friends, but asked the case worker to use her father's address for mailing. (04/06/23, tr. 25.) The case worker testified that Mother pled guilty to misuse of credit cards and aggravated theft. M.W. was placed in CCDCFS custody in May 2022, E.W. was placed in CCDCFS custody in August 2022, and the children remained in CCDCFS custody through the conclusion of the proceedings in this matter.

{¶ 10} CCDCFS developed a case plan to assist Mother with her mental health, parenting, substance abuse, and housing issues. CCDCFS case worker Alease Chisholm ("Case Worker Chisholm") testified that while Mother began services to address her substance abuse and mental health issues, she never completed them

and refused to submit to drug screens. Mother was also terminated from parenting services due to her non-engagement, having attended only "maybe three" of 18 sessions. (04/06/23, tr. 49-50; 04/10/23, tr. 26.) Case Worker Chisholm further testified that Mother had a referral for housing services and received a housing voucher from CMHA "but she never followed through with actually obtaining a house." (04/06/23, tr. 51.) Case Worker Chisholm testified that at the time of trial, Mother was living with her father and grandfather.

{¶ 11} The children were placed in foster care, M.W. with the initial foster caregiver from 2019, who was now serving as a kinship caregiver to the child, and E.W. with a foster caregiver. M.W. was previously placed with his current caregiver for 18 months during his prior period in CCDCFS custody and, again, had been in this placement for nearly a year since May 2022. M.W. is strongly bonded with his caregiver's family. He has made great strides since his return to their home and achieved a sense of permanency and stability. M.W.'s caregiver testified that M.W. loves the foster family and is very bonded with them. Conversely, there "isn't a bond with [M.W.] and [Mother]. It's more of he's afraid * * * he's running around. He's hiding. He's scared. He cries." (04/10/23, tr. 24.) Unlike his usually "happy-go-lucky" personality, M.W. became withdrawn prior to and during visits with Mother. (04/10/23, tr. 45, 49.) Mother was often late for visits with M.W. and was inconsistent in attending the visits, missing approximately half of the scheduled visits. Case Worker Chisholm testified Mother had not attended a visit with M.W. since December 2022.

**{¶ 12}** With regard to E.W., Case Worker Chisholm testified that Mother was more consistent in attending those visits, but after December 2022, Mother "may have seen [E.W.] three times." (04/10/23, tr. 41.) When Mother did attend visits with the children, M.W. would not interact with Mother, while E.W. "mainly cried the entire visit and [Mother] would become very frustrated and overwhelmed with the crying and unable to settle him down." (04/06/23; tr. 50.) Case Worker Chisholm testified that E.W. has "a good healthy bond" with his caregiver, who has "him in a lot of different activities that he enjoys." (04/10/23, tr. 24.) She described him as "a good, happy baby." (04/10/23, tr. 24.) Conversely, with Mother, E.W. is "always fussy. He's crying. He's resistant. He looks to [Case Worker Chisholm] to get him during the visits. He's just overwhelmed." (04/10/23, tr. 25.)

**{¶ 13}** With regard to M.W.'s father, the testimony at trial revealed that he was incarcerated for violent crimes with an anticipated release date from prison in 2025. E.W.'s alleged father never made himself available to CCDCFS in relation to E.W. and had not had any contact with the child for at least 90 days prior to trial.

**{¶ 14}** Case Worker Chisholm testified that CCDCFS did investigate the maternal grandfather but could not approve him as a caregiver based on the following: (1) Mother had been removed as a child and "aged out" of CCDCFS custody having never been returned to her father due to his failure to successfully complete case plan services; (2) grandfather's criminal history; (3) and the fact that he brought marijuana into the agency during the finger-printing background check

process. On cross-examination, Case Worker Chisholm testified that grandfather has a medical marijuana card but he did not present it at the time.

{¶ 15} Mother presented testimony from the maternal grandfather. He testified that he works at Home Depot and Blue Chip, has a business called I.W. Consulting Agency, and speaks for 360 Juvenile Advocates, which advocates for juvenile offenders. He testified that the reason Mother was removed from him was because she was pregnant and CCDCFS wanted custody of the baby. Mother was placed on a planned permanent living arrangement. He further testified that his criminal history was from 23 years ago. He tried calling CCDCFS about legal custody when the children were first placed with CCDCFS and continued to reach out up until the death of his grandchild. Maternal grandfather further testified that he is capable of caring for the children. He believed Mother should have custody of the children and that, if he were granted custody, he would allow her unrestricted access to the children.

{¶ 16} The GAL recommended "that permanent custody is in the children's best interest," noting that she "was involved when the children were in custody previously" and that Mother "sporadically engaged in case plan services." (04/10/23, tr. 79-80.) The GAL stated that Mother "had two years in the prior case, it's been * * * almost a year since [M.W.] was removed again, there's no change. So I can't in good conscience recommend anything other than permanent custody for these children." (04/10/23, tr. 82-83.) The GAL further noted the strong bond M.W. had with his caregivers, with whom he had been placed during his prior

removal. She stated that M.W. "is in a place that he identifies and clearly treats as a safe place." (04/10/23, tr. 89.) The GAL further related that E.W. "is very bonded with his current caregiver. This is the person he sees every day, that meets his needs every day, ensures he has food, he's changed. There is definitely a bond there given that this is his daily caregiver and he's very comfortable in all." (04/10/23, tr. 90.)

{¶ 17} The GAL acknowledged that she did not visit maternal grandfather's home, which he bought two weeks prior to trial and was in the process of renovating, because he had not provided her with an address. The GAL noted, however, that grandfather had a criminal history dating back to 2015, including offenses of driving without a license and while intoxicated, which raised concerns about substance abuse, as well as Mother's removal as a child and the failure to reunify with grandfather. The GAL stated grandfather's "history in iCase is a full page. * * * So without some further evaluation by [CCDCFS], * * * I can't in good conscience recommend custody to him since [Mother] wasn't even reunified with him." (04/10/23, tr. 85.)

{¶ 18} Following closing arguments, the trial court indicated that it would take the matter under advisement. The next day, the court issued a judgment entry in which it terminated Mother's and each respective Father's parental rights and found by clear and convincing evidence that it is in the best interests of the children to be placed in the permanent custody of CCDCFS. The court found that reasonable efforts were made for reunification, such as referring Mother to substance abuse, mental health, parenting, and basic needs/housing services. The paternal aunt was

not referred for services because she was incarcerated. The court further found that the children have been in agency custody for 12 or more months of a consecutive 22-month period; the children need secure permanent placement, which cannot be achieved without a grant of permanent custody; the parents demonstrated a lack of commitment toward the children; and legal custody to grandfather is not in the children's best interest. The court adopted the permanency plan, which consists of adoption. Mother now appeals the court's judgment.

## II. Law and Analysis

### A. Permanent Custody

{¶ 19} In the first assignment of error, Mother argues the court abused its discretion by granting permanent custody because CCDCFS failed to prove by clear and convincing evidence that permanent custody would be in the children's best interest.

{¶ 20} When reviewing a juvenile court's judgment in child custody cases, the Ohio Supreme Court has stated that the "court's decision in a custody proceeding is subject to reversal only upon a showing of abuse of discretion." *In re A.J.*, 148 Ohio St.3d 218, 2016-Ohio-8196, 69 N.E.3d 733, ¶ 27, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 417, 674 N.E.2d 1159 (1997).

{¶ 21} We recognize that the "[t]ermination of parental rights is an alternative of last resort but is sanctioned when necessary for the welfare of a child." *In re M.S.,* 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'An appellate

court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence.'" *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28, quoting *In re Jacobs*, 11th Dist. Geauga No. 99-G-2231, 2000 Ohio App. LEXIS 3859, 11 (Aug. 25, 2000), citing *In re Taylor*, 11th Dist. Ashtabula No. 97-A-0046, 1999 Ohio App. LEXIS 2620 (June 11, 1999). *See In re AR.S.*, 2021-Ohio-1958, 174 N.E.3d 28 (8th Dist.)

{¶ 22} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re C.B.*, 8th Dist. Cuyahoga No. 92775, 2011-Ohio-5491, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). "Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

{¶ 23} Here, CCDCFS requested permanent custody as part of its abuse, neglect, and dependency complaint as set forth in R.C. 2151.353(A)(4). This court has previously explained:

> When proceeding on a complaint with an original dispositional request for permanent custody, the trial court must satisfy two statutory requirements before ordering a child to be placed in the permanent custody of a children's services agency. Specifically, the trial court must find, "in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent,"

and further must determine "in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child." R.C. 2151.353(A)(4).

*In re A.R.*, 8th Dist. Cuyahoga No. 109482, 2020-Ohio-5005, ¶ 31.

{¶ 24} Under the first requirement of R.C. 2151.353(A)(4), the court must find that the child cannot be or should not be placed with either parent within a reasonable period of time under R.C. 2151.414(E). We note that "[o]nly one condition needs to be found to require the court to enter a finding that the children cannot or should not be placed with either parent and no factor is weighted greater than the others." *In re F.M.*, 8th Dist. Cuyahoga No. 110350, 2021-Ohio-3039, at ¶ 23, citing *In re S.C.*, 8th Dist. Cuyahoga No. 102350, 2015-Ohio-2410, ¶ 30.

{¶ 25} Here, the court's judgment entry reflects findings under six sections of R.C. 2151.414 — (E)(1), (4), (10), (12) (M.W. only), (14), and (16). These sections state, in relevant part:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> * * *
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the

child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

* * *

(10) The parent has abandoned the child.

* * *

(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.

* * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

* * *

(16) Any other factor the court considers relevant.

R.C. 2151.414(E).

{¶ 26} The trial court found that Mother and E.W.'s alleged Father have failed to substantially remedy the conditions causing the children's removal under R.C. 2151.414(E)(1); Mother and E.W.'s alleged Father have demonstrated a lack of commitment to the children under R.C. 2151.414(E)(4); Mother has not visited with M.W. since December 2022, and M.W.'s Father is incarcerated, and E.W.'s alleged Father has abandoned E.W. under R.C. 2151.414(E)(10); M.W.'s Father is incarcerated and will not be available under R.C. 2151.414(E)(12); Mother and E.W.'s alleged Father are unwilling to provide for the children's basic needs under

R.C. 2151.414(E)(14); and M.W. and another sibling were previously removed from Mother's care and placed in legal custody under R.C. 2151.414(E)(16).

{¶ 27} A review of the evidence in the record clearly and convincingly supports these findings. Since M.W. was placed in agency custody in 2019, Mother's progress on her case plan has been inconsistent and sporadic. Mother never completed her substance abuse and mental health portion of the case plan and refused to submit to drug screens. Mother was also terminated from parenting services due to her non-engagement, and Mother had a referral for housing services and received a housing voucher from CMHA, but she never followed through with obtaining a house. The record further demonstrates that Mother was inconsistent in attending the visits with M.W., missed approximately half of the scheduled visits, and had not attended any visits with M.W. since December 2022. Regarding E.W., the case worker testified that Mother was more consistent in attending those visits, but after December 2022, Mother may have seen E.W. three times. Moreover, M.W.'s Father is incarcerated and will not be released from prison until 2025 and E.W.'s alleged Father has abandoned E.W. Lastly, the record demonstrates that M.W. and another sibling were previously removed from Mother's care and placed in legal custody in 2019 and the other sibling died while under the care of paternal aunt.

{¶ 28} We note that Mother has not specifically challenged any of these findings. Rather, she contends that she was traumatized by the death of her child and CCDCFS did not allow her in-person visits with her children. Mother's claims,

however, fail to acknowledge that the visitation for M.W. was virtual because of his trauma and needs and that the visits with E.W. were in person but E.W. "mainly cried the entire visit" and Mother was "unable to settle him down."  (04/06/23, tr. 50.)  Because Mother fails to challenge any of the findings and the record clearly and convincingly supports multiple findings under R.C. 2151.1414(E), we find that the trial court did not abuse its discretion in finding that the children cannot be or should not be placed with either parent within a reasonable period.

{¶ 29} As to the second requirement, R.C. 2151.353(A)(4) requires the trial court find that permanent custody was in the best interest of the child in accordance with the factors listed in R.C. 2151.414(D)(1), which provides in relevant part:

In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) * * * of section 2151.353 * * *, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 30} Although a trial court is required to consider each relevant factor under R.C. 2151.414(D)(1) in deciding to award permanent custody, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. This court has stated that only one of these enumerated factors needs to be resolved in favor of the award of permanent custody. *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, ¶ 39, citing *In re Moore*, 8th Dist. Cuyahoga No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000).

{¶ 31} With regard to R.C. 2151.414(D)(1)(a), the court noted that both M.W. and E.W. are bonded with their caregivers. M.W. has lived with his caregiver for approximately two and a half years, and E.W. has been with his caregiver since birth. M.W. does not have visitation with his father, and maternal grandfather would communicate with M.W. during virtual visits with Mother. With regard to E.W., the court noted that he does not have a relationship with his alleged father or maternal grandfather. The court further noted that E.W. does not have a bond with Mother and is fussy and cries during visits. The trial court did not abuse its discretion in making these determinations.

{¶ 32} The record reveals that M.W. is strongly bonded with his caregiver and her family, where he has made great strides since his return to their home and has achieved a sense of permanency and stability. Case Worker Chisholm testified that "[M.W.] loves them. He calls it his home." (04/10/23, tr. 24.) Conversely, there really "isn't a bond with [M.W.] and [Mother]. It's more of he's afraid * * * he's

running around. He's hiding. He's scared. He cries." (04/10/23, tr. 24.) Mother was often late for visits with M.W. and was inconsistent in attending the visits, missing approximately half of the scheduled visits. (04/10/23, tr. 39-40.) Furthermore, Mother had not attended a visit with M.W. since December 2022. (04/10/23, tr. 24.) Mother was more consistent in attending her visits with E.W., but after December 2022, Mother "may have seen [E.W.] three times" from January to March 2023. (04/10/23, tr. 40-41.) When Mother did attend visits with E.W., he "mainly cried the entire visit and [Mother] would become very frustrated and overwhelmed with the crying and unable to settle him down." (04/06/23, tr. 50.) E.W. has "a good healthy bond" with his caregiver, with whom he is happy. (04/10/23, tr. 24.) Conversely, with Mother, E.W. is "always fussy. He's crying. He's resistant. He looks to [the case worker] to get him during the visits. He's just overwhelmed." (04/10/23, tr. 25.) In addition, M.W.'s father was incarcerated for conviction of violent crimes with an anticipated release date in 2025 and E.W.'s alleged father never made himself available to CCDCFS in relation to E.W. Moreover, the GAL noted the strong bond M.W. and E.W. had with their caregivers. The GAL did not believe it would be in either child's best interest to be removed from their respective current caregivers.

{¶ 33} R.C. 2151.414(D)(1)(b) requires the court to consider the child's wishes as expressed directly or through the child's GAL. Here, M.W. was four years old at the time of trial, while E.W. was just eight months old. The trial court noted that the children are too young to express their wishes and the GAL recommended

permanent custody for both M.W. and E.W., stating that permanent custody was in the children's best interest. The court did not abuse its discretion in making this finding.

{¶ 34} R.C. 2151.414(D)(1)(c) requires the court to consider the child's custodial history, including whether the child has been in placement for 12 or more months of a consecutive 22-month period. With regard to M.W., the court noted that this was his second time in CCDCFS custody. M.W. was first in CCDCFS custody from 2019 to November 2021 and then again in May 2022. E.W. was placed in agency custody at the time of his birth in August 2022, and has remained in continuous agency custody since that time. Based on the foregoing, we cannot find that the trial court abused its discretion in making this determination.

{¶ 35} R.C. 2151.414(D)(1)(d) requires the court to consider the child's need for a legally secure placement and whether such can be achieved without a grant of permanent custody. With regard to each child, the trial court found that "[t]he child deserves a safe and stable environment where all of his needs can be met and he can thrive." (Judgment Entry, 04/11/23.) With regard to M.W., the court found that "[t]his cannot be achieved without permanent custody as father is incarcerated until 2025 and Mother has failed to engage in and complete case plan services so that she can provide a safe and stable environment for the child." (Judgment Entry, 04/11/23.) With regard to E.W., the court found that "[t]his cannot be achieved without permanent custody as alleged father does not have a relationship with the child and has not had any contact with CCDCFS and Mother had failed to engage in

and complete case plan services so that she can provide a safe and stable environment for the child and remedy the cause for removal. No other relatives were identified as appropriate to care for the child." (Judgment Entry, 04/11/23, Case No. AD23900574.) As previously discussed, Mother has continuously failed to follow her case plan and has not demonstrated stable housing. Accordingly, the trial court did not abuse its discretion.

{¶ 36} We note that Mother's argument at trial was not that the children should be returned to her, but that the children be ordered to remain in agency custody and the order of temporary custody be extended. The trial court correctly noted, however, that it could not "give an extension because they [the children] haven't been placed in the temporary custody of [CCDCFS]." Mother argues on appeal that she could have engaged with treatment. However, the GAL noted that Mother "had two years in the prior case, it's been a year since — almost a year since [M.W.] was removed again, there's no change." (04/10/23, tr. 82-83.)

{¶ 37} R.C. 2151.414(D)(1)(e) requires the trial court to consider whether any of the factors in sections (E)(7) to (11) apply. Here, the trial court made abandonment findings under R.C. 2151.414(E)(10), which are supported by the record.

{¶ 38} As with the first requirement, we note that Mother does not challenge any of the R.C. 2151.414(D)(1) factors. Instead, Mother argues that trial court abused its discretion by denying the motion for legal custody to the maternal grandfather, citing to *In re Ar.S.*, 8th Dist. Cuyahoga No. 111028, 2021-Ohio-1200,

comparing the facts of that case to the instant case. Initially, we must recognize that the cited opinion by Mother has been vacated by this court and replaced with a subsequent opinion on reconsideration, *In re Ar.S.*, 2021-Ohio-1958, 174 N.E.3d 28 (8th Dist.).

{¶ 39} Regarding the facts of the case, we find *In re Ar.S.* distinguishable and unpersuasive. *In re Ar.S.*, this court, in a split decision, reversed an award of permanent custody when the children, who were older, expressed a desire to live with their aunt who had been a part of their lives since they were born. *Id.* at ¶ 51-65. The *In re Ar.S* Court noted that the children's aunt wanted custody; raised three successful children; believed the children should remain with family; had a suitable home for the children, which was approved by CCDCFS; was willing to facilitate the children's contact with their mother; and had a fiancé who was employed and ready to assist with the children. *Id.* at ¶ 46. Whereas in the instant case, the children were too young to express their wishes; they had no bond with maternal grandfather; and there were other concerns about grandfather's ability to be the children's legal custodian. The trial court found that "[b]ased on the evidence and testimony provided, and the court weighing the credibility of the witnesses, the Court does not find that legal custody to [maternal grandfather] is in the child[ren]'s best interest." (Judgment Entry, 04/11/23.)

{¶ 40} Additionally, as noted above, the trial court lacked authority to order legal custody to maternal grandfather given the lack of a signed statement of understanding, which is a condition precedent to a trial court's authority to award

legal custody to a proposed custodian. *In re C.D.Y.*, 8th Dist. Cuyahoga No. 108355, 2019-Ohio-4987 ¶15 ("The court cannot award legal custody of a child to a nonparent unless he or she 'signs a statement of understanding for legal custody that contains' various provisions listed in the statutes. R.C. 2151.353(A)(3)(a)-(d).") The trial court was well within its discretion in determining that the children's best interest would be better served by permitting them to remain in their current placements, where they were bonded, rather than committing them to the legal custody of their maternal grandfather, who had little to no bond with the children, Mother was removed as a child, and grandfather had a concerning criminal history.

{¶ 41} Based on the foregoing, we find there is clear and convincing evidence in the record to support the court's determination that permanent custody to CCDCFS is in the children's best interests. Accordingly, we find that the court's decision to grant permanent custody is not against the evidence as Mother contends. We further find that the court did not abuse its discretion in determining that permanent custody of the children be awarded to CCDCFS.

{¶ 42} Therefore, the first assignment of error is overruled.

**B.  GAL Report**

{¶ 43} In the second assignment of error, Mother claims the GAL failed to perform her duties under Sup.R. 48 because the GAL "did not interview or do a home visit with the maternal grandfather."

{¶ 44} Ohio Sup.R. 48.03 sets forth responsibilities for guardians ad litem. Relevant to this appeal, it states that the GAL represent the best interest of the child;

become informed about the facts of the case and contact all relevant persons; and visit the child at the residence or proposed residence of the child in accordance with any standards established by the court.[4]

{¶ 45} Preliminarily, we recognize that this court has previously stated:

> [C]ourts have generally refused to conclude that a guardian ad litem's failure to comply with Sup.R. 48(D) constitutes grounds for reversal. *Miller v. Miller*, 4th Dist. Athens No. 14CA6, 2014-Ohio-5127, ¶ 17-18. Sup.R. 48(D) is a general guideline, and its directives serve "to provide the court with relevant information and an informed recommendation regarding the child's best interest[.]" *Id.*, quoting Sup.R. 48(D). Thus, "a trial court has discretion to consider a guardian's opinion and report even when the guardian does not comply with the directives found in Sup.R. 48(D)(13)." *In re T.S.*, 2d Dist. Greene Nos. 2016-CA-26 and 2016-CA-28, 2017-Ohio-482, ¶ 36.

*In re N.B.*, 8th Dist. Cuyahoga No. 105028, 2017-Ohio-1376, ¶ 26.

{¶ 46} In support of her claim, Mother cites to *Nolan v. Nolan*, 4th Dist. Scioto No. 11CA3444, 2012-Ohio-3736, where the Fourth District Court of Appeals found that, based on the unique facts of the case, the GAL's testimony and report should have been stricken from the record because GAL's investigation fell below the minimum standards established in Sup.R. 48. *Id.* at ¶ 25-27. In *Nolan*, the GAL conducted only a limited investigation and failed to visit the homes of the parents or conduct interviews with several key individuals, including the child, the mother's live-in boyfriend, the child's half-sister, school personnel, and medical providers. *Id.* at ¶ 8, 25. The GAL filed a report in which he recommended terminating the

---

[4] We note that the Rules of Superintendence were amended in 2021 and the references to Sup.R. 48(D) are now found in Sup.R. 48.03.

shared parenting plan and designating the mother as residential parent and legal custodian, concluding that this would be in the child's best interest. *Id.* at ¶ 9.

{¶ 47} Mother's reliance on *Nolan* is misplaced. The *Nolan* decision was fact specific. *Id.* at ¶ 26-27. *See In re C.O.*, 8th Dist. Cuyahoga Nos. 99334 and 99335, 2013-Ohio-5239, ¶ 19; *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 56; *In re L.S.*, 8th Dist. Cuyahoga No. 108666, 2019-Ohio-5347, ¶ 17 (where this court has repeatedly rejected similar claims by appellants when they cited to *Nolan* in support of their argument). In the matter before us, the GAL advised the trial court that the grandfather failed to remain at court as requested following a previous hearing so that she could obtain his address to facilitate a visit to his home. The GAL also advised that the grandfather had just recently told her that "he had purchased [his home] two weeks ago, that he was in the process of repainting it, redoing the flooring in the home, and he had moved everything out of the house. So even if [the GAL] came on Sunday, there wasn't going to be anything in the house." (04/10/23, tr. 87.) The GAL further advised that she had concerns about grandfather's criminal history and potential substance abuse issues, as well as his history with the juvenile court and CCDCFS and failure to achieve reunification with Mother. The GAL could not, "in good conscience recommend custody to [grandfather] since [Mother] wasn't even reunified with him." (04/10/23, tr. 85.) Despite Mother's claim to the contrary, the record demonstrates that the GAL fulfilled her duties as the children's guardian ad litem.

{¶ 48} The second assignment of error is overruled.

## III. Conclusion

{¶ 49} There is clear and convincing evidence in the record to support the court's determination that permanent custody to CCDCFS is in the children's best interests. Accordingly, the court's decision to grant permanent custody is not against the evidence. Furthermore, the court did not abuse its discretion in determining that permanent custody of the children be awarded to CCDCFS. The record also demonstrates that while the GAL did not visit the maternal grandfather's home, the GAL still fulfilled her duties to M.W. and E.W.

{¶ 50} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR